Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| ROSA LINDA RAMOS MEDINA; LILLIAM DÍAZ MONTALVO; CARLOS TORRES SANTIAGO; MILAGRO A. RIVERA OLIVER; MIRIAM GREENIDGE; CARLOS GREENIDGE; CARMEN I. LÓPEZ VARGAS; TERESA VÉLEZ ROLÓN; MARÍA DE LOS ÁNGELES LÓPEZ TORRES; SAUL FIGUEROA MORALES; YARALIS ALCOVER VINA; HEBER FIGUEROA MORALES<br><br>Recurrentes<br><br>v.<br><br>OFICINA DE GERENCIA DE PERMISOS; CENTRAL WASTE SERVICES, INC.<br><br>Recurridos | KLRA202400554 | Recurso de *Revisión Administrativa*, procedente de la Junta Adjudicativa de la Oficina de Gerencia de Permisos del Departamento de Desarrollo Económico y Comercio<br><br>Caso Núm.: 2023-481388-CUB-009323<br><br>Sobre: Consulta de Ubicación |

Panel integrado por su presidenta, la Jueza Brignoni Mártir, la Jueza Álvarez Esnard y la Jueza Prats Palerm.

*Prats Palerm, Jueza Ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 20 de marzo de 2025.

Comparecen los recurrentes de epígrafe ("recurrentes") mediante un *Recurso de Revisión.* Nos solicitan la revisión de la *Resolución* emitida el 30 de julio de 2024 y notificada el 5 de agosto de 2024, por la Oficina de Gerencia de Permisos ("OGPe"). En virtud del referido dictamen, la OGPe aprobó la Consulta de Ubicación Número 2023-481388-CUB-009323, solicitada por Central Waste Services, Inc. ("Central Waste"), para el uso de un distrito Industrial Especializado (I-E) en el Barrio Factor del Municipio de Arecibo.

Por los fundamentos expuestos a continuación, se *Confirma* el dictamen administrativo recurrido.

**I.**

El caso presente tuvo su génesis el 10 de diciembre de 2010 mediante la aprobación de la Consulta de Ubicación, 2009-06-0301-JPU, solicitada por el señor José J. Berríos Rivera ("señor Berríos Rivera"), por conducto de José Ramos & Associates ante la Junta de Planificación.[1] En aquella ocasión, dicha agencia autorizó la segregación de unos solares y la ubicación de un proyecto industrial liviano en un terreno ubicado en la Carretera PR-683, kilómetro 1.6, en el Barrio Factor del Municipio de Arecibo. En específico, permitió la segregación de tres (3) solares destinados a los siguientes fines: (1) uso comercial, (2) almacenamiento de materiales terminados, y (3) utilización de taller de mecánica pesada, oficinas y estacionamiento para camiones. A su vez, aprobó los parámetros de construcción para Comercial Intermedio (C-I) e Industrial Liviano (I-L), y su posterior recalificación una vez las obras propuestas terminaran.

Trascurrido el tiempo, en julio de 2021, JB Properties LLC ("JB Properties"), como la nueva entidad propietaria del terreno objeto de la consulta, inició el proceso de planificación ambiental, mediante la presentación de un documento de evaluación ambiental (EA) ante la OGPe, con la intención de solicitar la enmienda de la Consulta de Ubicación, 2009-06-0301-JPU. Tras los trámites de rigor, el 22 de octubre de 2022, la OGPe aprobó la Determinación de Cumplimiento Ambiental para la Evaluación Ambiental. En esta, la agencia recurrida concluyó que, conforme al documento de evaluación ambiental, el proyecto propuesto no presentaba un impacto ambiental significativo y dio por terminado el proceso de evaluación ambiental.

Como corolario, el 21 de julio de 2023, Central Waste peticionó una enmienda a la referida consulta de ubicación en el caso 2023-481388-

---

[1] Apéndice de la parte recurrente, págs. 128-148.

CUB-009323 sometido ante la OGPe.[2] En específico, solicitó que la referida agencia designara el terreno previamente aludido como distrito Industrial Especializado (I-E). Ese día, a los fines de notificar dicho procedimiento, la corporación recurrida colocó un rótulo en la propiedad objeto de la consulta. El rótulo de presentación dispuso que el tipo de proyecto propuesto era aquel correspondiente a un distrito Industrial Liviano (I-L).[3]

El 18 de julio de 2023, el señor Berríos Rivera —sin identificar la corporación proponente— notificó a los vecinos colindantes respecto al trámite objeto de la consulta. En su escrito, explicó en qué consistía el proyecto:

> El propósito de esta comunicación es notificarle formalmente sobre la presentación de solicitud para la Enmienda a la Consulta de Ubicación 2023-481388-CUB-009323 ante la Oficina de Gerencia de Permisos para la instalación y operación de un centro de reciclaje de desperdicios sólidos no peligrosos provenientes de la industria de la construcción, en la dirección mencionada en la referencia. **Este proyecto se considera como un uso industrial liviano.** Esta notificación se hace en cumplimiento con la Regla 2.2.2.2 del Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo y Uso de Terreno 2020.[4]

(Énfasis suplido)

Eventualmente, el 15 de agosto de 2023, JB Properties, quien es la entidad propietaria del terreno objeto de la consulta, indicó mediante el *Aviso de Método Alterno de Notificación* publicado en el periódico Primera

---

[2] Conviene puntualizar que, en el expediente administrativo de la OGPe constan unos documentos relativos a la consulta solicitada mediante el portal electrónico de la agencia. Surge de la información brindada en dicho portal que, Central Waste aparece como dueño de proyecto y JB Properties Inc. como dueño del terreno objeto de la consulta. A su vez, en el expediente ante nos obra una *Certificación de Proyectista, Especialista o Contratista* sometida ante la OGPe. En este documento, se indica que el ingeniero licenciado, el señor Nelson Reyes Ortiz, solicita un permiso para un centro de reciclaje cuyo nombre es Central Waste Recycling .

[3] Apéndice de la parte recurrente, pág. 316.

[4] Apéndice de la parte recurrente, pág. 319. Surge del expediente ante nos que, los siguientes vecinos fueron notificados: (1) el señor Gilberto Santiago Ríos, (2) la señora Miraflores del Atlántico Corp., (3) el señor José Francisco Laguna Rivera, (4) el señor Luis A. Rivera Ortiz, (5) la señora Julia Águila Rivera, (6) el señor Heriberto Martínez Laureano, (7) el señor Pablo A. Vélez Rivera, y (8) la señora María de los Ángeles López Torres. En esa línea, se señaló también que no alcanzaron a identificar en el Centro de Recaudación de Ingresos Municipales ("CRIM") los propietarios de tres (3) predios colindantes cuyos números catastrales son los siguientes: (1) 032-082-497-07; (2) 032-000-006-56, y; (3) 032-052-533-18. Véase, también, Apéndice de la recurrente, págs. 324-327.

Hora que presentó por conducto del ingeniero Nelson Reyes, la Consulta de Ubicación Núm. 2023-481388-CUB-009323 ante la OGPE.[5]

Iniciado el procedimiento administrativo, una serie de vecinos colindantes al proyecto solicitaron la intervención en el caso. En atención a ello, la OGPe emitió unas determinaciones intituladas *Resolución sobre Solicitud de Intervención* en las que consta que Central Waste es la corporación solicitante de la consulta. En dichas determinaciones, la agencia mencionada autorizó la intervención de los vecinos.[6]

Con posterioridad, el 16 de agosto de 2023, la señora Lilliam Díaz y la señora Nydia Vázquez suscribieron una carta intitulada *Solicitud de Celebración de Vista Pública* remitida a la OGPe.[7] Ambas aseveraron que la consulta propuesta implica un cambio sustancial al ambiente. En lo pertinente, destacaron que les preocupaban los efectos de la trituración, el almacenamiento de cemento y otros materiales que incidirían en la calidad del aire, el suelo y el agua, así como el ruido de las maquinarias. Considerada tal solicitud, el 14 de mayo de 2024, la OGPe señaló la celebración de una vista pública mediante el sistema de videoconferencia para el 18 de junio de 2024.

A esos efectos, Central Waste colocó un rótulo en la propiedad objeto de la consulta con el propósito de anunciar la fecha, la hora, el enlace a la vista pública y la dirección al portal de internet para obtener copia del expediente.[8] A su vez, publicó dos (2) avisos en el periódico El Vocero el 31 de mayo de 2024.[9] En estas publicaciones precisó que la corporación peticionaria era Central Waste, representada por el ingeniero

---

[5] Apéndice de la parte recurrente, pág. 328.
[6] Apéndice de la parte recurrente, pág. 332-388. Según el expediente sometido ante nos, las siguientes personas fueron reconocidas como partes interventoras: la señora Lilliam Díaz Montalvo, (2) el señor Jorge A. Domena Martínez, (3) el señor Alfredo Santana, (4) la señora Carmen Crespo, (5) el señor Jonathan Santos y (6) la señora Mara Morgado Moreno, (7) la señora Rosa L. Ramos, (8) la señora Miriam Greenidge y el señor Carlos Greenidge, (9) el señor Mariano Ramis de Ayreflory, (10) el señor Jesús Rodríguez Cruz, (11) la señora Yaralis Alcover, (12) la señora Carmen I. López, (13) el señor Juan Trinidad ("las partes interventoras"), según constan en los expedientes sometidos a nuestra consideración
[7] Apéndice de la parte recurrente, págs. 329-330.
[8] Apéndice de la parte recurrente, pág. 315.
[9] Apéndice de la parte recurrente, págs. 433-434.

Nelson Reyes Ortiz. No obstante, puntualizó que los dueños de la propiedad eran Central Waste, JB Properties y el señor Berríos Rivera.[10] Respecto a la consulta solicitada, se incluyó el siguiente comunicado:

> En la vista del caso de referencia se interesa discutir, pero sin limitarse a: solicitud de consulta de ubicación vía variación en uso consistente en segregación y proyecto comercial e industrial consistente en la construcción de una planta de reciclaje para materiales de construcción y operaciones para manejar desperdicios sólidos no peligrosos. La solicitud se evaluará a tenor, pero sin limitarse, a lo establecido en las Reglas 2.2.2. m 2.2.3 y 6.1.17 del Reglamento Conjunto y sus disposiciones sobre variación en uso. La parte proponente tendrá que justificar su solicitud.[11]

En igual fecha, Central Waste notificó a los vecinos colindantes mediante correo certificado.[12] A su vez, el 3 de junio de 2024, notificó a las partes interventoras por medio de sus correos electrónicos.[13]

A tenor con los procedimientos calendarizados, el 18 de junio de 2024, los vecinos colindantes y las partes interventoras comparecieron a la vista pública.[14] En representación de Central Waste, identificada allí como corporación peticionaria, asistieron el ingeniero Alejandro Pinto Flores, la agrónoma Elvelisse Figueroa y la licenciada María Martínez Avilés y el licenciado Fernando Molini Vizcarrondo.[15]

Celebrada la vista pública, el Oficial Examinador de la OGPe rindió un *Informe de Vista de Pública* el 9 de julio de 2024.[16] En la *Relación del Caso* esbozó lo siguiente:

> Central Waste Services, Inc., parte peticionaria, solicita a la Oficina de Gerencia de Permisos (OGPe) enmendar la consulta de ubicación 2009-06-030 l-JPU, que fuera aprobada el 10 de

---

[10] Apéndice de la parte recurrente, pág. 434.

[11] Apéndice de la parte recurrente, pág. 434.

[12] Apéndice de la parte peticionaria, págs. 428-432. Hacemos referencia a los vecinos notificados, según consta en el expediente administrativo: (1) la señora Priscilla Claudio Meléndez; (2) el señor Pedro Méndez; (3) JB Properties, LLC; (4) el señor Gilberto Santiago Ríos; (5) RD Truck Center, LLC; (6) la señora Vanessa De Mari Monserrate; (7) Miraflores del Atlántico Corp.; (8) el señor Francisco Laguna Rivera; (9) el señor Luis A. Rivera Ortiz; (10) la señora Julia Águila Rivera; (11) el señor Heriberto Martínez Laureano; (12) el señor Pablo A. Vélez Rivera; (13) la señora María de los Ángeles López Torres, y; (14) el señor Aníbal Correa Santiago,

[13] Apéndice de la parte recurrente, págs. 434-448.

[14] Surge del expediente ante nuestra consideración que, específicamente comparecieron las siguientes personas: (1) el licenciado Pablo A. Vélez Rivera, (2) la señora Rosa L. Ramos Medina, (3) el señor Juan Carlos Muñoz, (4) el ingeniero Herber Figueroa Morales, (5) la señora Marisol González, (6) la señora María de los Ángeles Torres López, (7) el señor Ángel Ortiz en representación de la representante Mariana Nogales, (8) el señor Jonathan Santos, (9) la señora Lilliam Díaz, (10) el señor Josean Figueroa Oms, y (11) el señor Carlos Torres Santiago.

[15] Apéndice de la parte recurrente, pág. 478.

[16] Apéndice de la parte recurrente, págs.478-501.

diciembre de 2010, para que se autoricen usos de un distrito Industrial Especializado (1-E) en un predio de aproximadamente 12.01 cuerdas, localizado en la Carretera PR-683, Kin. 1.6 en el Barrio Factor del Municipio de Arecibo.

**Obra en el expediente administrativo la escritura de compraventa y cancelación de hipoteca número 111 donde se dispone que el titular de la misma es JB Properties, LLC, y la finca fue adquirida de Central Waste Services, Inc. Dicha finca es la 6,670 y consta inscrita en el folio 205 del tomo 1 de Arecibo del Registro de la Propiedad de Puerto Rico, Sección Primera de Arecibo. La finca ante nos tiene el número de catastro 032-062-533-29 y se encuentra registrada en el Centro de Recaudaciones Municipales (CRIM) a nombre de JB Properties, LLC. También obra en el expediente autorización de JB Properties, LLC, para presentarse esta consulta de ubicación.** [17]

(Énfasis suplido)

Luego de considerar las posturas de las partes allí presentes, el Oficial Examinador recomendó en el *Informe* la aprobación de la consulta, siempre y cuando se siguieran los parámetros de construcción correspondientes al distrito industrial, que quedan recogidos en la *Resolución* objeto de este recurso apelativo. De igual manera, dispuso que se consideraran a los residentes de zonas aledañas, pues presentaron serias preocupaciones respecto al proyecto. Especificó que, los residentes manifestaron inquietud por el ruido que actualmente produce la corporación proponente, el cual posiblemente aumentará con la consulta propuesta, así como el polvo fugitivo y otros inconvenientes generados por la entrada y salida de vehículos pesados.

A luz de la prueba presentada y la totalidad del expediente administrativo, el 30 de julio de 2024, la Junta Adjudicativa de la OGPe emitió una *Resolución*, notificada el 5 de agosto de 2024, en la cual acogió el *Informe de Vista Pública* en todos sus extremos y aprobó el distrito de calificación Industrial Especializado (I-E).[18] En lo concerniente, formuló tres (3) determinaciones de hechos y decretó una serie de condiciones:

1. En reunión celebrada el 30 de julio de 2023, se presentó ante la consideración de la Junta Adjudicativa de la Oficina de Gerencia de Permisos ("OGPe"), el Informe del Oficial Examinador ("Informe"), Lcdo. Miguel Mihaijevich de Jesús, relacionado a una vista celebrada y presidida por éste, el día 18 de junio de 2024, para la evaluación del Proyecto de epígrafe ("Proyecto").

---

[17] Apéndice de la parte recurrente, pág. 478.
[18] Apéndice de la parte recurrente, págs. 474-477.

2. El referido Informe, incluye determinaciones de hechos, conclusiones de derecho y una recomendación favorable del Oficial Examinador con relación a la aprobación de la Consulta de Ubicación para el Proyecto.

3. Luego de evaluar y discutir todos los méritos de este caso, y al amparo de los poderes y facultades conferidos por la Ley Núm. 161-2009., según enmendada, conocida como la *Ley para la Reforma del Proceso de Permisos de Puerto Rico* y *el Reglamento Conjunto para la Evaluación* y *Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios esta Junta Adjudicativa* RESUELVE:

i. Se acoge el Informe del Oficial Examinador en todas sus partes, y se hace formar parte integral de la presente Resolución como si estuviera aquí transcrito.

ii. Conforme a la recomendación del Oficial Examinador, en virtud de las facultades conferidas mediante las leyes, normas y órdenes administrativas vigentes, se determina aprobar la Consulta de Ubicación Número 2023-481388-CUB-009323 para el Proyecto arriba descrito, sujeta al cumplimiento de todos los requisitos efectuados por las agencias de infraestructura, los cuales habrán de tomarse en consideración al prepararse y someterse en la próxima etapa como parte del trámite del Proyecto Propuesto.

iii. La aprobación queda condicionada a que se asfalten todas les vías internas por donde transiten vehículos de motor con el propósito de disminuir la cantidad de polvo que se genera al transitar por camino de tierra.

iv. Previo al inicio de la operación se deberá contar con la barrera sónica tanto en la parte vegetativa la cual se requiere que se siembre un seto vivo de suficiente tamaño para cubrir las verjas o paredes de doce (12) pies de altura que circunvalen toda la operación de trituración, incluyendo la ubicación de la máquina trituradora como el área de almacenaje.

v. El horario de trituración de material deberá ser reducido a lo propuesto por el Proponente al horario de 7:00 a. m. a 3:00 p. m.

vi. De conformidad con la Regla 2.2.5 Términos de Vigencia de las Determinaciones Finales del Reglamento Conjunto, la vigencia de la Consulta de Ubicación aquí aprobada será de dos (2) años a partir de la notificación de la presente Resolución, sujeto a los términos dispuestos en la citada Regla.

vii. Se ordena a la División de Secretaría y Servicio al Cliente a notificar la presente Resolución a todas las partes y participantes que surgen del Informe y del SBP, anejando copia del Informe, el cual conforme a la Sección 2.1.10.16 del Reglamento Conjunto, será archivado en el expediente, como un documento público para todos los efectos legales, tan pronto se firme la resolución.[19]

En desacuerdo, el 24 de agosto de 2024, los recurrentes de epígrafe y una serie de residentes colindantes a Central Waste presentaron ante la OGPe una *Solicitud de Revisión Administrativa,* acompañada de un listado extenso que incluyó sus nombres con sus respectivas firmas más

---

[19] Apéndice de la parte recurrente, págs. 474-477.

su información de contacto.[20] En esencia, expusieron serias preocupaciones en torno al impacto del polvo fugitivo, los residuos, la acumulación de gomas y los escombros metálicos que produce Central Waste. Por tanto, exigieron que Central Waste presentara una Declaración de Impacto Ambiental (DIA). No obstante, transcurrido el término de quince (15) días para atender la reconsideración, la OGPe rechazó de plano la solicitud presentada.

Inconformes con el proceder administrativo, el 8 de octubre de 2024, los recurrentes acudieron ante este foro apelativo intermedio mediante un *Recurso de Revisión*. En su escrito, presentaron los siguientes señalamientos de errores:

> PRIMER ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL AUTORIZAR USOS PARA UN DISTRITO INDUSTRIAL ESPECIALIZADO Y RECALIFICAR TODO EL PREDIO SIN INFORMAR AL PÚBLICO Y A LOS COLINDANTES QUE SE SOLICITA UN USO DE UN DISTRITO INDUSTRIAL ESPECIALIZADO, NI LA REZONIFICACIÓN DEL PREDIO NI VARIACIONES EN USO.
>
> SEGUNDO ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL APROBAR ARBITRARIAMENTE UNA RECALIFICACIÓN DEL PREDIO A INSDUSTRIAL ESPECIALIZADO QUE PERJUDICARÁ SIGNIFICATIVAMENTE A LA COMUNIDAD RESIDENCIAL DONDE SE PROPONE, Y SIN DISCUTIR LOS CRITERIOS REGLAMENTARIOS APLICABLES.
>
> TERCER ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL APROBAR UN PROYECTO A BASE DE UNA DETERMINACIÓN DE CUMPLIMIENTO AMBIENTAL NULA EN DERECHO POR SER ESTA VIOLATORIA A LA LEY 161-2009, LA LEY 416-2004 Y EL DEBIDO PROCESO DE LEY.
>
> CUARTO ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL APROBAR UN PROYECTO INDUSTRIAL ESPECIALIZADO EN UN SECTOR RESIDENCIAL A BASE DE UNA EVALUACIÓN AMBIENTAL ARBITRARIA Y DEFICIENTE.
>
> QUINTO ERROR: ERRÓ LA OFICINA DE GERENCIA DE PERMISOS (OGPE) AL AUTORIZAR EL PROYECTO DE CENTRAL WASTE Y LA EFECTIVA REZONIFICACIÓN DE LA TOTALIDAD DE LOS TERRENOS (12 CUERDAS) SIN ANTES PREPARAR Y NOTIFICAR ANTES UNA DECLARACIÓN DE IMPACTO AMBIENTAL.
>
> SEXTO ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL APROBAR ARBITRARIAMENTE UN USO DE UN

---

[20] Apéndice de la parte recurrente, págs. 502-520.

DISTRITO INDUSTRIAL ESPECIALIZADO, SIN APROBARSE EXPRESAMENTE NI FUNDAMENTARSE LAS VARIACIONES EN USO SOLICITADAS.

SÉPTIMO ERROR: ERRÓ LA JUNTA ADJUDICATIVA DE LA OGPE AL APROBAR LA CONSULTA DE UBICACIÓN A UN PROPONENTE SIN LEGITIMACIÓN ACTIVA.

Sometido el recurso, el 11 de octubre de 2024, esta Curia emitió *Resolución* en la cual concedimos a las partes recurridas el término de treinta (30) días para presentar su alegato. En adición, le concedimos a la parte recurrente un término de treinta (30) días para presentar la transcripción de la Vista Pública. Ese día, ordenamos a la Junta Adjudicativa de la OGPe a elevar el expediente administrativo del caso (2023-481388-CUB-009323).

En cumplimiento con lo decretado, la OGPe presentó el *Alegato de la Oficina de Gerencia de Permisos al Recurso de Revisión Judicial* el 12 de noviembre de 2024. A su vez, el 20 de noviembre de 2024, los recurrentes presentaron la transcripción correspondiente.

Con posterioridad, en exceso del término indicado para comparecer, el 19 de diciembre de 2024, Central Waste presentó una *Solicitud de Desestimación por Falta de Jurisdicción y Nulidad* fundamentada en el alegado hecho en que la señora Rosa Linda Ramos Medina presentó un escrito de revisión administrativa ante la OGPe sin estar admitida a la profesión legal. Así las cosas, el 10 de enero de 2025, este Tribunal de Apelaciones ordenó a la parte recurrente a presentar su posición en o antes del 30 de enero de 2025 respecto a la solicitud de desestimación. En el término indicado, los recurrentes de epígrafe presentaron su *Oposición a Solicitud de Desestimación*. En esencia, puntualizaron que el escrito de reconsideración se presentó oportunamente por la señora Rosa Linda Ramos por derecho propio y sin ejercer la abogacía ilegalmente. Indicaron, a su vez, que en el referido documento se incluyeron las firmas de doscientas veinte (220) personas residentes a las comunidades aledañas al terreno objeto de la consulta, quienes se oponen al proyecto.

El 5 de febrero de 2025, esta Curia denegó la solicitud de desestimación instada por Central Waste y le ordenó a presentar su alegato en oposición en un término de quince (15) días. Finalmente, el 20 de febrero de 2025, Central Waste presentó su *Alegato en Oposición*.

Con el beneficio de la comparecencia de las partes y la OGPe, procedemos a discutir el marco legal pertinente a la controversia ante nos.

**II.**

### A. Estándar de revisión judicial de los organismos administrativos

Es norma reiterada que, los tribunales revisores apelativos están llamados a conceder amplia deferencia a las decisiones de las agencias administrativas. *Otero Rivera v. Bella Retail Group, Inc.* 2024 TSPR 70, 214 DPR ___ (2024); *OCS v. Point Guard Ins.*, 205 DPR 1005, 1026 (2020). Tales determinaciones gozan de experiencia y conocimiento especializado sobre los asuntos ante su consideración. *OEG v. Martínez Giraud*, 210 DPR 79, 88 (2022); *Capó Cruz v. Jta. Planificación et al.*, 204 DPR 581, 591 (2020). Por tanto, respecto a las determinaciones de hechos agenciales, los tribunales no intervendremos en estas, siempre y cuando surja del expediente administrativo evidencia sustancial que las respalda. *The Sembler Co. v. Mun. De Carolina,* 185 DPR 800, 821-822 (2012). La evidencia sustancial es aquella prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión. *Capó Cruz v. Jta. de Planificación et al., supra.* 591.

No obstante, la Sección 4.5 de la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9675, según enmendada, dispone que "[l]as conclusiones de derecho serán revisables en todos sus aspectos". Cuando de conclusiones de derecho se trata, tenemos una amplia facultad de revisarlas completa y absolutamente. *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 745 (2012); *Assoc. Ins. Agencies, Inc. v. Com. Seg.* P.R., 144 DPR 425, 436 (1997). Lo anterior, sin embargo, "no equivale a la sustitución automática del criterio e interpretación del organismo administrativo". *Capó Cruz v.*

*Jta. de Planificación et al., supra,* pág. 591; *Rolón Martínez v. Caldero López,* 201 DPR 26, 36 (2018).

Ahora bien, la deferencia a las determinaciones agenciales no es infinita. No podemos imprimir un sello de corrección a las determinaciones o las interpretaciones administrativa irrazonables, ilegales o contrarias a derecho. *Super Asphalt v. AFI y otro,* 206 DPR 803, 819 (2021). Nuestra deferencia cede cuando: (1) la decisión no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o reglamentos; (3) ha mediado una actuación arbitraria, irrazonable o ilegal, o (4) la actuación administrativa lesiona derechos constitucionales fundamentales. *Capote Rivera v. Voili Voila Corporation,* 213 DPR 743, 754-755 (2024); *Super Asphalt v. AFI y otro, supra.* No obstante, la determinación de una agencia merece deferencia sustancial aun cuando su interpretación no sea la única razonable. *Torres Santiago v. Depto. Justicia,* 181 DPR 969, 1003 (2011). Solo es posible sustituir "el criterio de la agencia por el del tribunal revisor cuando no exista una base racional para explicar la decisión administrativa". *Capote Rivera v. Voili Voila Corporation, supra,* pág. 754; *Capó Cruz v. Jta. de Planificación et al., supra,* pág. 591.

### B. *Procedimiento de Planificación Ambiental*

La Constitución del Estado Libre Asociado de Puerto Rico establece como política pública la más eficaz conservación de los recursos naturales. Artículo VI, Sec. 19, Const. ELA, LPRA, Tomo 1. Cónsono con lo anterior, la Ley Núm. 416 del 22 de septiembre de 2004, según enmendada, conocida como la *Ley de Política Pública Ambiental de Puerto Rico* ("Ley Núm. 416-2004"), 12 LPRA sec. 8001 *et seq.*, fue promulgada con la intención de alentar y promover el bienestar general del medioambiente.

Así las cosas, la Ley Núm. 161-2009, *supra,* establece un proceso de planificación ambiental, mediante el cual la entidad gubernamental deberá obtener, evaluar y analizar "toda la información necesaria para

asegurar que se tomen en cuenta los impactos ambientales a corto y largo plazo, de sus decisiones". Art. 1.5 de la Ley Núm. 161-2009, 23 LPRA sec. 9011. El proceso de planificación ambiental es un proceso informal *sui generis* al cual no le es aplicable la LPAU. *Íd.*

En lo que concierne al caso de autos, el aludido estatuto establece que, cuando la agencia proponente sea la OGPe, el proceso de planificación ambiental iniciará mediante la presentación de una Evaluación Ambiental ("EA") o Declaración de Impacto Ambiental ("DIA"), según aplicable. Art. 8.5 de la Ley Núm. 161-2009, 23 LPRA sec. 9018d. En aquellos casos que el documento sometido sea una EA, "la División de Evaluación de Cumplimiento Ambiental evaluará el documento ambiental y remitirá sus recomendaciones al Director Ejecutivo". *Íd.* De tal modo que, el Director Ejecutivo determine el cumplimiento ambiental. *Íd.*

Ahora bien, de presentarse una DIA, la División de Evaluación de Cumplimiento Ambiental ("DECA") evaluará la misma y remitirá sus recomendaciones a la Junta Adjudicativa para que esta emita una determinación. *Íd.*

Asimismo, "[l]as [DIA] y aquellas [EA] que requieran un proceso de evaluación "*NEPA-Like Process*", serán comentadas por el público en general durante el proceso de planificación ambiental, mediante vista pública, según aplique". *Íd.* Cónsono con lo anterior, el Reglamento Conjunto establecerá los mecanismos a través de los cuales tendrá lugar la participación de personas distintas al solicitante en el proceso de evaluación de determinaciones finales. Art. 8.6 de la Ley Núm. 161-2009, 23 LPRA sec. 9018e.

A tenor con la Ley Núm. 161-2009, la JCA promulgó el *Reglamento para el Proceso de Evaluación Ambiental*, Reglamento Núm. 8858, aprobado el 23 de noviembre de 2016 ("Reglamento Núm. 8858"). La Regla 120 del Reglamento Núm. 8858, regula la información que deberá incluir la EA. Entre la información requerida, la referida regla requiere la siguiente:

A. Acción proyectada que incluya:

> 1. Una descripción narrativa de la acción proyectada y la necesidad o el propósito de la acción;

> .     .     .     .     .     .     .     .

> 7. Mapas de localización y ubicación, o fotografía aérea a escala 1:20,000 del área que ilustre las condiciones existentes, las estructuras o elementos colindantes al predio del proyecto. Se deberán identificar los usos colindantes;

> .     .     .     .     .     .     .     .

B. Contenido técnico que incluya la siguiente información. Cuando alguno de los asuntos aquí dispuestos no sea aplicable a la acción propuesta, se deberá explicar la no aplicabilidad. De haber impactos en los asuntos a discutirse, se deberán describir los mismos según corresponda a cada asunto y, a su vez, **presentar las medidas de mitigación propuestas**.

> 1. Descripción detallada de la flora y fauna del área bajo evaluación, con sus nombres comunes y científicos, incluyendo metodología utilizada en la investigación o censo de las especies descritas. **En aquellos casos donde se identifiquen o encuentren especies vulnerables o en peligro de extinción según definido por la reglamentación estatal o federal, se deberá incluir información relacionada con su distribución, abundancia relativa, cadenas alimentarias, habitáculos, y las relaciones entre las especies existentes en el área**;

> .     .     .     .     .     .     .     .

> 7. Infraestructura disponible y propuesta para las etapas o fases de construcción y operación. Para la misma se deberá indicar lo siguiente, incluyendo impactos, si alguno, y medidas de mitigación:
> > a. […]
> > b. aumento en tránsito vehicular a generarse;
> > c. rutas de acceso al proyecto propuesto;

> .     .     .     .     .     .     .     .

> 8. Distancia del proyecto a la residencia más cercana;
> 9. Distancia del proyecto a la zona de tranquilidad más cercana;
> 10. Tendencias de desarrollo y población del área bajo consideración y cualquier información relacionada con estas variables que pueda justificar la acción o determinar los impactos resultantes.

> .     .     .     .     .     .     .     .

> 18. En el caso de proyectos para fuentes de emisión atmosférica deberán, además, especificar e incluir lo siguiente:
> > **a. capacidad máxima estimada de cada fuente de emisión (equipos, procesos, consumo, etc.) en unidades convenientes**, si aplica;
> > b. equipo y/o medidas para el control de la contaminación atmosférica;
> > **c. estimado de emisiones de contaminantes atmosféricos criterios, peligrosos o que contribuyan al efecto de invernadero, en toneladas por año.**

(Énfasis suplido). Regla 120 del Reglamento Núm. 8858.

De manera particular, en el caso de proyectos de instalaciones para el manejo y disposición de desperdicios, el Reglamento Núm. 8858 requiere que la EA incluya una **comunicación escrita de la Autoridad de Desperdicios Sólidos** ("ADS"), o de la agencia con jurisdicción sobre este asunto, donde se establezca que el proyecto propuesto es cónsono con el Plan Regional de Infraestructura para el Reciclaje y Disposición de los Desperdicios Sólidos de Puerto Rico, o cualquier otro plan relacionado. (Énfasis suplido). Regla 120 (B)(16) del Reglamento Núm. 8858. En adición, la EA deberá discutir el tipo de desperdicios a ser manejados, las alternativas propuestas para su manejo y los criterios considerados del lugar para el establecimiento de la instalación. Regla 120 (B)(17) del Reglamento Núm. 8858.

Por otro lado, se deberá preparar una Declaración de Impacto Ambiental ("DIA") para toda acción que pueda tener un impacto significativo sobre el ambiente. Regla 121 del Reglamento Núm. 8858. Al evaluar si una acción tendrá un impacto significativo se deberá considerar lo siguiente:

1. Contexto - Se refiere a que la acción propuesta se deberá analizar en varios contextos y/o ámbitos, tales como, pero sin limitarse a: la sociedad en general o al individuo, la región afectada, los intereses afectados, y la localización. "Significativo" varia con el escenario de la acción propuesta y las características particulares de cada caso. Serán relevantes a la evaluación los efectos a largo plazo y a corto plazo.

2. Intensidad - Se refiere a la severidad del impacto ambiental, tomando en consideración factores, tales como:
   a. Impactos que podrán ser beneficiosos y adversos simultáneamente. Nótese que el efecto podrá considerarse significativo aun cuando el balance sea beneficioso.
   b. El grado en que la acción propuesta afecte la salud o seguridad pública.
   c. Características particulares del área geográfica, tales como la proximidad a recursos históricos o culturales, áreas recreativas, suelo agrícola, humedales, cuerpos de agua o áreas ecológicamente sensitivas o críticas.
   d. Si los efectos sobre el medioambiente son inciertos o involucran riesgos particulares.
   e. Si la acción podría establecer un precedente para acciones futuras con efectos significativos, o represente una decisión, en principio, sobre una consideración futura.
   f. Si la acción se relaciona con otras acciones, las cuales de forma individual no tienen impacto ambiental significativo, pero en conjunto tienen impactos ambientales significativos. Se considerará significativo si razonablemente se puede prever un impacto significativo

acumulativo sobre el medioambiente. El segmentar o fraccionar una acción, o denominarla como temporera, no impedirá la evaluación y determinación de "impacto ambiental significativo".

g. El grado en que la acción presenta la posibilidad de violentar algún estatuto o reglamento estatal o federal, o algún requisito impuesto para la protección del medioambiente. *Íd.*

En *Hernández, Álvarez v. Centro Unido, supra*, pág. 646, nuestro más Alto Foro expresó que, no le compete al Tribunal determinar si procede la necesidad de preparar una DIA. De tal modo que, en casos como el de epígrafe, el rol de los tribunales se circunscribe a determinar si el criterio especializado de la agencia recurrida, de no requerir una DIA, no tiene base racional. *Íd.*

### C. *Debido Proceso de Ley en el Ámbito Administrativo*

El debido proceso de ley es un derecho fundamental reconocido tanto en nuestra Constitución como en la Constitución Federal. Artículo II, Sec. 7, Const. ELA, LPRA, Tomo 1; Emda. V y XIV, Const. EE.UU. Dicha garantía opera en dos dimensiones distintas, a saber, la sustantiva y la procesal. *ELA et al. v. Molina Figueroa*, 186 DPR 461 (2012). El debido proceso de ley sustantivo pretende proteger y salvaguardar los derechos fundamentales de las personas al requerirle al Estado justificación al intervenir con los mismos. Por otro lado, en su vertiente procesal el debido proceso de ley busca garantizar que la interferencia con los intereses de libertad o propiedad de las personas se lleve a cabo a través de un procedimiento que sea imparcial y justo.

Nuestra jurisprudencia ha establecido varios requisitos que todo procedimiento adversativo debe cumplir para satisfacer las exigencias mínimas del debido proceso de ley, a saber: que las partes sean notificadas adecuadamente del proceso; que las partes tengan la oportunidad de ser oídos; que el proceso se lleve a cabo ante un juzgador imparcial; que las partes tengan derecho a contrainterrogar a los testigos y a examinar la evidencia presentada en su contra; que la decisión se base en evidencia presentada y admitida en juicio y que las partes tengan

derecho a tener asistencia de abogado. *Hernández v. Secretario*, 164 DPR 390 (2005); *Rivera Rodríguez v. Lee Stowell*, 133 DPR 881 (1993).

En el ámbito administrativo, el procedimiento exigido, además de satisfacer las exigencias mínimas del debido proceso de ley, requiere una decisión administrativa informada, con conocimiento y comprensión de la evidencia, basada en el expediente y sustentada con determinaciones de hechos y conclusiones de derecho. *Calderón v. CFSE*, 181 DPR 386, 399 (2011); *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 47 (2010). Lo vital es que el proceso respete la dignidad de los ciudadanos afectados contra la arbitrariedad administrativa, de manera que la persona afectada pueda cuestionar las razones y la legalidad de la acción. *Picorelli v. Departamento de Hacienda*, 179 DPR 720, 736 (2010).

Además, la Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, en su sección 3.1, 3 LPRA sec. 9641 (en adelante LPAU), dispone que en un procedimiento adjudicativo formal ante una agencia las personas tienen garantizados los siguientes derechos: (1) ser notificado oportunamente de los cargos o querellas o reclamos en contra de una parte; (2) presentar evidencia; (3) una adjudicación imparcial; y (4) que la decisión sea basada en el expediente.  Cónsono con lo anterior, la sección 3.13 (b) de la LPAU, 3 LPRA sec. 9653(b) establece que:

> "El funcionario que presida la vista dentro de un marzo de relativa informalidad ofrecerá a todas las partes la extensión necesaria para una divulgación completa de todos los hechos y cuestiones en discusión, la oportunidad de responder, presentar evidencia y argumentar, conducir contrainterrogatorio y someter evidencia en refutación, excepto según haya sido restringida o limitada por las estipulaciones en la conferencia con antelación a la vista."

Asimismo, la Sección 3.18 de la LPAU, 3 LPRA sec. 9658, reitera que la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y en la revisión judicial es el expediente administrativo.

### D. Rótulo de Presentación de Solicitudes sobre Consultas de Ubicación

La Ley Núm. 161–2009, según enmendada, conocida por la "Ley para la Reforma del Proceso de Permisos de Puerto Rico", 23 LPRA sec.

9011 *et seq.*, se aprobó con el propósito de establecer el marco legal y administrativo que regirá la solicitud, evaluación, concesión y denegación de permisos de uso y de construcción y desarrollo de terrenos por parte del Gobierno de Puerto Rico. Exposición de Motivos de la Ley Núm. 161–2009; *Horizon v. Jta. Revisora, RA Holdings*, 191 DPR 228 (2014). Atinente a la controversia ante nos, el Artículo 9.9 de la Ley Núm. 161-2009, 23 LPRA sec. 9019h, requiere la instalación de un rótulo de presentación de solicitud o inicio de actividad.

Cónsono con lo anterior, la Sección 2.1.9.12 del *Reglamento Conjunto para la Evaluación y Expedición de Permisos relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios*, Reglamento Núm. 9473, aprobado el 16 de junio de 2023 ("Reglamento Conjunto") dispone que el solicitante deberá instalar un rótulo en la entrada principal de la propiedad donde se llevará a cabo la obra. Asimismo, el inciso (e) de la referida sección estipula que "[e]l incumplimiento con la obligación de colocar el rótulo, según se dispone en esta sección y el Artículo 9.9 de la Ley 161-2009, según enmendada, se entenderá como un defecto de notificación".

Por otra parte, el rótulo deberá cumplir con las siguientes especificaciones:

1. Número de solicitud
2. Tipo de solicitud presentada
3. Tipo de proyecto propuesto
4. Dueño y proponente de la obra
5. Dirección postal y electrónica de la OGPe, JP, o Municipio Autónomo con Jerarquía de la I a la III para recibir comentarios sobre la solicitud. Sección 2.1.9.12 (h) del Reglamento Conjunto.

El inciso (g) de la Sección 2.1.9.12 advierte que, "[c]ualquier incumplimiento con la presente Sección implicará el archivo de la solicitud".

### E. Criterios de Evaluación aplicables a las Consultas de Ubicación

Sobre la consideración de las enmiendas a consultas, la Sección 2.2.3.15 del Reglamento Conjunto lee como sigue:

a.  Si surge la necesidad de hacer cambios a un proyecto que altere la consulta aprobada, se deberá someter una solicitud de enmienda, explicando en detalle la naturaleza de la enmienda y la razón para la misma, así como toda la documentación (planos, estudios, etc.) pertinente y necesaria para que la Junta pueda tomar la determinación correspondiente. Dicha solicitud deberá presentarse en el SUI. No obstante, a lo anterior, se podrá solicitar cualquier otra información necesaria que estime pertinente para considerar la enmienda. Como resultado de la evaluación de los cambios propuestos y dependiendo de la naturaleza y magnitud de los mismos con relación a la consulta original, se podrá requerir la presentación de una nueva consulta y el cobro correspondiente.

b.  La presentación de una enmienda antes de tomar una determinación sobre la consulta presentada originalmente, podría tener el efecto de reiniciar los trámites interagenciales, lo que aumentaría el tiempo necesario para su análisis. De ser éste el caso, el período para resolver, comenzará a partir de la fecha de presentación de la enmienda.

c.  El proponente notificará a cualquier parte reconocida con copia de toda la documentación sometida al presentar la enmienda, haciendo constar en el escrito que presente, a quiénes notificó y la fecha de la notificación.

d.  Se evaluará la magnitud de la enmienda para determinar si la enmienda propuesta necesita una extensión a la vigencia de la consulta o si por el contrario se trata de asuntos menores los cuales no ameritan una nueva vigencia de la consulta.

Asimismo, la Sección 2.2.3.3 del Reglamento Conjunto esboza una serie de factores a considerar, previo a la aprobación de una Consulta de Ubicación. Entre los factores que deberán ser considerados, la aludida disposición reglamentaria señala los siguientes: (1) la viabilidad, aceptabilidad y conveniencia del uso propuesto; (2) la manera en la que se atenderán las necesidades de la comunidad donde ubica el proyecto propuesto y **cómo el mismo responde al interés público**; y (3) si existe la infraestructura necesaria para atender las necesidades del proyecto propuesto y para mitigar sus efectos directos e indirectos. (Énfasis suplido). *Íd.*

De igual manera, la Sección 2.2.2.5 del Reglamento Conjunto añade otra serie de factores que deberán ser presentados ante la consideración de la OGPe, mediante un memorial explicativo, al resolver cualquier solicitud sobre asuntos discrecionales. Atinente a la controversia ante nos, la aludida sección estipula que el memorial explicativo deberá contemplar: (1) la densidad poblacional del área; (2) los usos existentes

del sector; (3) las condiciones ambientales; (4) las condiciones sociales, económicas y físicas análogas; (5) la situación de la infraestructura física y social en el lugar.

### E. Legitimación activa

En nuestro sistema de derecho, la doctrina de justiciabilidad requiere la existencia de un caso o controversia real para que los tribunales puedan ejercer válidamente su jurisdicción. *Rivera Segarra v. Rivera Lassén,* 2024 TSPR 60, 213 DPR ___ (2024); *Hernández, Santa v. Srio. de Hacienda,* 208 DPR 727, 738 (2022). En ese sentido, la jurisdicción significa el poder o la autoridad que posee un tribunal o un organismo administrativo para considerar y decidir casos o controversias con efecto vinculante para las partes. *Muñoz Barrientos v. ELA et al.*, 212 DPR 714, 726 (2023); *Adm. Terrenos v. Ponce Bayland,* 207 DPR 586, 600 (2021).

Una controversia es justiciable cuando existan partes con intereses encontrados cuyo propósito sea obtener un remedio que tenga un efecto sobre la relación jurídica. *Asoc. Fotoperiodistas v. Rivera Schatz,* 180 DPR 920, 931 (2011); *E.L.A. v. Aguayo*, 80 DPR 552, 584 (1958**).** En cambio, no es justiciable cuando una de las partes carece de legitimación activa. *Ramos, Méndez v. García García,* 203 DPR 379, 394 (2019); *Bhatia Gautier v. Gobernador,* 199 DPR 59, 68-69 (2017). En armonía con lo anterior, la doctrina de justiciabilidad exige evaluar si la parte reclamante posee legitimación activa. *Hernández, Santa v. Srio. de Hacienda, supra,* págs. 738-739*; Hernández Torres v. Gobernador,* 129 DPR 824, 835 (1992).

La legitimación activa significa "la capacidad que se le requiere a la parte promovente de una acción para comparecer como litigante ante el tribunal [o el organismo administrativo], realizar con eficiencia actos procesales y, de esta forma, obtener una sentencia vinculante". *Ramos, Méndez v. García García, supra,* pág. 394; *Bhatia Gautier v. Gobernador, supra,* pág. 69. Así pues, esta doctrina, como norma general, requiere que la parte que solicite algún remedio demuestre que: (1) ha sufrido un

daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una conexión entre el daño sufrido y la causa de acción ejercitada; y (4) la causa de acción surge al palio de la Constitución o de una ley. *Hernández, Santa v. Srio. de Hacienda, supra*, pág. 739; *Bhatia Gautier v. Gobernador, supra*, pág. 69. Tales consideraciones permiten que el promovente demuestre que posee un interés de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal o al foro correspondiente las cuestiones en controversia. *Ramos, Méndez v. García García, supra*, pág. 394; *Sánchez et al. v. Srio. de Justicia et al.*, 157 DPR 360, 371 (2002).

### F. Examen de legitimación activa en la OGPe de conformidad con la Ley Núm. 161-2009 y el Reglamento Conjunto 2023

La Carta de Derechos de la Constitución de Puerto Rico reconoce como derechos fundamentales la vida, la libertad y el disfrute de la propiedad. Por lo que, ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley. Artículo II, Sección 7, Const. PR, LPRA Tomo I. A su vez, nuestra Constitución instaura como política pública la más eficaz conservación de los recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad. Artículo VI, Sección 19, Const. PR, LPRA Tomo I.

En virtud de estos principios constitucionales, la Asamblea Legislativa de Puerto Rico adoptó la Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley Núm. 161-2009, 23 LPRA sec. 9011, según enmendada ("Ley Núm. 161-2009") a los fines de crear la Oficina de Gerencias de Permisos. El Artículo 1.2 de la legislación en referencia delinea los objetivos que aspira alcanzar como parte de su política pública:

> El Gobierno de Puerto Rico adopta como política pública el mejorar la calidad y eficiencia en la administración de los procesos de evaluación de solicitudes para el otorgamiento, autorización o denegación de licencias, inspecciones, querellas, certificaciones,

consultas, autorizaciones y cualquier trámite necesario o que incida de forma alguna en la operación de un negocio en Puerto Rico, así como determinaciones finales y permisos para desarrollos de proyectos de construcción. Como parte de dicha política pública es vital asegurar la transparencia, certeza, confiabilidad y agilización del proceso de evaluación para el otorgamiento o denegación de determinaciones finales y permisos, además de la emisión de recomendaciones. Dichos procesos para la evaluación, otorgamiento o denegación de las licencias, inspecciones, querellas, certificaciones, autorizaciones, determinaciones finales y permisos están revestidos del más alto interés público por ser un instrumento de desarrollo económico y como tal indispensable para la creación de empleos y la prestación de mejores servicios al pueblo y el disfrute de una mejor calidad de vida. Todo esto asegurando el fiel cumplimiento con las leyes y reglamentos y teniendo como norte el poder insertarnos dentro del marco de la competitividad que incluya el máximo desarrollo en lo concerniente al aspecto económico, social y físico sostenible del Pueblo de Puerto Rico. Este Artículo en conformidad con las disposiciones constitucionales según estipuladas en el Artículo II, Sección 7, y el Artículo VI, Sección 19 de la Constitución de Puerto Rico. 32 LPRA sec. 9011.

A esos fines, el Artículo 8.1 de la Ley Núm. 161-2009, *supra,* dispone que la OGPe tendrá jurisdicción para atender una serie de solicitudes, tales como las consultas de ubicación:

A partir de la vigencia de esta Ley, cualquier persona que interese solicitar permisos, recomendaciones, licencias, o certificaciones relacionadas al desarrollo y uso de terrenos en Puerto Rico o cualquier otra autorización o trámite que sea necesario, según establecido en el Artículo 1.3, 2.5 y 7.3 de esta Ley, podrá hacerlo ante la Oficina de Gerencia de Permisos, sea a nivel central o regional, Municipios Autónomos con Jerarquía I a V o mediante un Profesional Autorizado, según aplique.

Las solicitudes a ser presentadas ante la Oficina de Gerencia de Permisos, Municipios Autónomos con Jerarquía I a V o un Profesional Autorizado, según aplique, incluirán aquellas establecidas en el Reglamento Conjunto de Permisos, incluyendo, pero sin limitarse a: **consultas de ubicación**; permisos de segregación o lotificación; permisos de construcción; permisos de uso; permiso único; documentos ambientales; permisos o recomendaciones previamente evaluados y otorgados por las Entidades Gubernamentales Concernidas con relación al desarrollo y uso de terrenos y cualquier otra solicitud dispuesta mediante Reglamento Conjunto. Además, la Oficina de Gerencia de Permisos expedirá aquellas certificaciones y documentos requeridos para hacer u operar negocios en Puerto Rico, con sujeción a las disposiciones del Artículo 2.6 de esta Ley. No obstante, para ello se dispondrá de un procedimiento mediante reglamento adecuado para someter comentarios por parte de la ciudadanía. Finalmente, la Oficina de Gerencia de Permisos y los Municipios Autónomos con Jerarquía de la I a la V podrán emitir Permisos Verdes.

En específico, la Junta Adjudicativa de la OGPe tendrá la autoridad en ley para evaluar las solicitudes relacionadas con los permisos, entre estos, aquellos relativos a las consultas de ubicación, según establece la Sección 6.3 de la Ley Núm. 161-2009, *supra*:

La Junta Adjudicativa tendrá los siguientes deberes, facultades y funciones generales, además de aquéllos conferidos por esta Ley, o por cualquier otra ley:

(a) evaluar y adjudicar solicitudes de carácter discrecional;

(b) evaluar y adjudicar asuntos en áreas no calificadas. En estos casos las determinaciones no establecerán una política general o definirán política pública, quedando esta responsabilidad en jurisdicción exclusiva de la Junta de Planificación;

(c) celebrar vistas;

(d) como parte de sus determinaciones, podrá hacer modificaciones o imponer cualquier condición necesaria para la aprobación de la solicitud;

(e) descargar cualquier otra función que se le delegue mediante esta Ley

.        .        .        .        .        .        .        .

La Junta Adjudicativa y el Director Ejecutivo descargarán sus funciones en cumplimiento con el Plan de Usos de Terrenos, Planes de Ordenación Territoriales aplicables, los Reglamentos de Planificación, el Reglamento Conjunto y cualquier legislación y reglamentación aplicable. El Presidente será responsable de convocar las sesiones para atender los asuntos ante su consideración y de mantener la agenda de la Junta Adjudicativa dentro de los términos establecidos en el Reglamento Conjunto. 23 LPRA sec. 9016g.

En aras de viabilizar estas facultades, el 16 de junio de 2023, la Junta de Planificación en colaboración con la OGPe y las entidades gubernamentales concernidas adoptaron el Reglamento Conjunto para la Evaluación y Expedición de Permisos Relacionados al Desarrollo, Uso de Terrenos y Operación de Negocios, Reglamento Conjunto, Núm. 9473, de la Junta de Planificación ("Reglamento Conjunto").

En lo pertinente a la controversia que nos ocupa, la Sección 2.1.9.1 (a) del Reglamento Conjunto (2023), *supra*, prescribe quién puede presentar la solicitud de consulta ante la OGPe:

a. Toda solicitud de recomendaciones, consultas, licencias, autorizaciones, certificaciones o permisos relacionados al desarrollo y uso de terrenos en Puerto Rico, podrá ser promovida por el dueño, optante o arrendatario de la propiedad debidamente autorizado, por sí o a través de su representante autorizado, por el Jefe de la Agencia o su representante autorizado en el caso de los proyectos públicos.

A esos efectos, la Sección 2.1.9.5 del cuerpo reglamentario precitado exige que la persona que presente la solicitud ante la OGPe acredite que ostenta legitimación activa de la siguiente manera:

a. Toda solicitud relacionada al desarrollo y uso de terrenos en Puerto Rico, cualquier otra autorización o trámite definido en este Reglamento, será promovida por el dueño, optante o arrendatario de la propiedad con autorización, por sí o a través de su representante autorizado por el Jefe de la Agencia o su representante autorizado en caso de un proyecto público. Aquellas solicitudes presentadas al amparo de lo dispuesto en la Ley Núm. 135 de junio de 1967, según enmendada, conocida como la Ley de Certificaciones, serán promovidas exclusivamente por los profesionales designados en dicha ley.

b. Tendrá que incluirse evidencia fehaciente que establezca legitimación activa de que el proponente es dueño, o es optante o arrendatario debidamente autorizado por el legítimo dueño de la propiedad, mediante copia simple de uno o más de estos documentos:

1. Escritura pública.
2. Contrato de arrendamiento.
3. Contrato de opción de compra.
4. Certificación registral.
5. Declaratoria de herederos.
6. Transacción de Terrenos debidamente aprobada por la JP.
7. De ser una persona jurídica, se presentará documentación que acredite su existencia y autorización para hacer negocios en Puerto Rico o Estados Unidos.

c. Cuando se trate de más de un propietario, se someterá evidencia de que todos autorizan la acción propuesta ante la OGPe o Municipio Autónomo con Jerarquía I a la III, que se ha delegado dicho derecho a una sola persona.

d. Cuando se trate de una propiedad o terreno público, el solicitante deberá establecer su legitimación activa mediante autorización expresa de la instrumentalidad pública que le autoriza a solicitar el permiso o consulta.

e. Cuando se trate de mejoras públicas en terrenos de una propiedad privada, el proponente someterá evidencia de que notificó al titular del predio.

f. Cuando la solicitud de servicio sea presentada por un profesional licenciado, éste deberá incluir la evidencia donde demuestre que el profesional es licenciado y colegiado en Puerto Rico.

De esta manera, la agencia puede constatar que la parte proponente cumple con el criterio de legitimación activa, cuya finalidad permite evaluar si el solicitante posee la capacidad que se le requiere para comparecer como litigante ante el tribunal, o en este caso, el organismo administrativo, y así también, realizar con eficiencia actos procesales y obtener un dictamen vinculante. Véase *Ramos, Méndez v. García García, supra*, pág. 394; *Bhatia Gautier v. Gobernador, supra*, pág. 69.

## III.

Mediante el primer error señalado, los recurrentes aducen que la OGPe incidió al aprobar la Consulta de Ubicación, a pesar de que el

público no fue adecuadamente informado sobre el tipo de proyecto propuesto. Particularmente, sostienen que el rótulo colocado por los proponentes fue defectuoso porque informó, incorrectamente, que el tipo de proyecto propuesto era uno correspondiente a un distrito Industrial Liviano (I-L), en lugar de Industrial Especializado (I-E).

La Sección 9.9 de la Ley Núm. 161-2009, *supra*, así como la Regla 2.1.9.12 del Reglamento Conjunto les imponen a los proponentes de un trámite discrecional ante la OGPe la necesidad de instalar un rótulo en la entrada de la propiedad donde se llevará a cabo la obra, **con la intención de notificarle al público sobre el proyecto propuesto**.

Conforme surge del expediente, el mismo día que Central Waste solicitó la enmienda a la Consulta de Ubicación, el proponente instaló un rótulo frente a la propiedad, según requerido por el *Reglamento Conjunto*. Consecuentemente, varios vecinos del área advinieron en conocimiento de la solicitud presentada por Central Waste y, como resultado, solicitaron la intervención en los procedimientos.

Ante ello, independientemente de que la rotulación se desviara en ciertos aspectos de los requisitos que establece el *Reglamento Conjunto*, tal defecto, de por sí, no invalida la determinación de la OGPe. Resulta un hecho irrefutable que, los defectos de la rotulación no evitaron que los residentes participaran de los procedimientos. Como corolario, el primer error no fue cometido por la OGPe.

Los errores segundo y sexto serán discutidos de manera conjunta entender que están intrínsecamente relacionados. En síntesis, los recurrentes arguyen que la OGPe incidió al recalificar el predio a un distrito Industrial Especializado, sin aprobar las variaciones en uso solicitadas y sin tomar en consideración los criterios reglamentarios aplicables. Particularmente, aducen que la determinación de la OGPe no examinó los siguientes factores: (1) viabilidad, aceptabilidad y conveniencia del uso propuesto; (2) manera en la que se atenderán las necesidades de la comunidad donde ubica el proyecto propuesto y cómo

el mismo responde al interés público; (3) si existe la infraestructura necesaria para atender las necesidades del proyecto propuesto y para mitigar sus efectos directos e indirectos; (4) densidad poblacional; (5) usos existentes del sector; (6) las condiciones ambientales; (7) condiciones sociales, económicas y físicas análogas; y (8) la infraestructura física y social en el lugar.

Al examinar el expediente, nos percatamos de que los criterios señalados por los recurrentes fueron discutidos ampliamente, tanto en la vista pública, como en la documentación sometida ante la OGPe. Tanto así que, tomando en consideración las tres (3) preocupaciones primordiales de los recurrentes, a saber, aumento en el tráfico, polvo fugitivo y los niveles de ruido, la OGPe, condicionó la aprobación de la consulta de ubicación a lo siguiente:

> i. [...]
>
> ii. Conforme a la recomendación del Oficial Examinador, [...] se determina aprobar la Consulta de Ubicación Número 2023-481388-CUB-009323 [...] **sujeta al cumplimiento de todos los requisitos efectuados por las agencias de infraestructura**, los cuales habrán de tomarse en consideración al prepararse y someterse en la próxima etapa como parte del trámite del Proyecto Propuesto.
>
> iii. La aprobación **queda condicionada a que se asfalten todas las vías internas por donde transiten vehículos de motor con el propósito de disminuir la cantidad de polvo que se genera** al transitar por camino de tierra.
>
> iv. Previo al inicio de la operación **se deberá contar con la barrera sónica** tanto en la parte vegetativa la cual se requiere que se siembre un seto vivo de suficiente tamaño para cubrir las verjas o paredes de doce (12) pies de altura que circunvalen toda la operación de trituración, incluyendo la ubicación de la máquina trituradora como el área de almacenaje.
>
> v. El horario de trituración de material deberá ser reducido a lo propuesto por el Proponente al horario de 7:00 a. m. a 3:00 p. m.
>
> vi. [...]
>
> vii. [...] [21]
>
> (Énfasis suplido)

Cónsono con lo anterior, constatamos que las preocupaciones de los recurrentes fueron atendidas por la OGPe. De modo que, la aprobación de la consulta de ubicación fue condicionada a diversas medidas de

---

[21] Apéndice de la parte recurrente, págs. 474-475.

mitigación, entre ellas, la construcción de un muro para amortiguar el sonido y el requerimiento de asfaltar las calles dentro del predio para evitar el polvo fugitivo. Asimismo, fue sujetada al cumplimiento con todas las recomendaciones y requerimientos de las agencias de infraestructura. Así dispuesto, no podemos concluir que criterios reglamentarios aplicables no fueron considerados por la agencia recurrida al emitir su determinación final.

Por otro lado, contrario a lo sostenido por la parte recurrente, la enmienda solicitada por Central Waste no recalificó el predio, toda vez que el uso propuesto por los proponentes ya estaba contemplado dentro de lo autorizado para los distritos Industrial Liviano (I-L). No debemos perder de perspectiva que, el predio en controversia cuenta con una consulta de ubicación, aprobada hace catorce (14) años, para uso Comercial Liviano e Industrial Liviano. De tal modo que, la OGPe tomó en consideración que el predio ya contaba con permisos para llevar a cabo una operación industrial en el predio.

Resulta menester recordar que, la OGPe es la agencia especializada que cuenta con el *expertise* necesario para adecuadamente procesar las consultas de ubicación. Nuestro rol en estos casos se limita a determinar si la actuación de la agencia cumplió con las disposiciones estatutarias aplicables. A raíz de ello, sus determinaciones al respecto merecen nuestra deferencia.

Los errores tercero, cuarto y quinto serán discutidos de manera conjunta, por estar encaminados a impugnar el procedimiento de planificación ambiental llevado a cabo en el recurso de epígrafe. Los recurrentes alegan que debían ser notificados del inicio del procedimiento de planificación ambiental, con el propósito de poder participar del mismo. Asimismo, sostienen que el documento de evaluación ambiental presentado por los proponentes fue arbitrario y deficiente, toda vez que no contempló los niveles de ruido, el tráfico y las especies en peligro de extinción que podrían ser encontradas en el terreno. Aducen, además,

que, debido al impacto significativo ambiental, la OGPe debía exigirles a los proponentes la presentación de una DIA.

Examinado el marco legal aplicable, no encontramos disposición estatutaria que exija la participación de la comunidad durante el proceso de planificación ambiental. Según se desprende del Reglamento Núm. 8858, durante las vistas públicas la comunidad tendrá el derecho de presentar los comentarios relacionados al documento de evaluación ambiental y la determinación de evaluación ambiental correspondiente. Conforme surge del expediente, durante la vista pública celebrada en el caso de marras la parte recurrente tuvo amplia oportunidad para cuestionar e impugnar el proceso de planificación ambiental.

Por otro lado, inspeccionado el documento de evaluación ambiental presentado por los proponentes, comprobamos que Central Waste observó los requisitos de forma establecidos por la Regla 120 del Reglamento Núm. 8858. Mediante la EA, se expuso que, la acción propuesta de construir las facilidades necesarias para la operación de un centro de acopio y reciclaje de materiales de construcción no tendría un impacto significativo en el medioambiente. De igual manera, se señaló que los impactos ambientales inevitables se reducirían o mitigarían mediante una serie de medidas, relacionadas a los permisos necesarios.[22]

Así dispuesto, la OGPe emitió su *Determinación de Cumplimiento Ambiental para Evaluación Ambiental*. En su determinación, la agencia recurrida resaltó que la EA sometida por Central Waste cumplía con todos los requisitos de la Ley Núm. 416-2004, *supra*, y con el Reglamento Núm. 8858, dando así por terminado el proceso de evaluación ambiental.[23]

De manera particular, sobre los niveles de sonido, la OGPe hizo constar que el proponente implementaría medidas para reducir el ruido. A su vez, señaló que, la maquinaria del proyecto sería instalada lo más alejada posible de las zonas residenciales, por lo que, no se esperaba que

---

[22] Apéndice de la parte recurrente, pág. 243-244.
[23] Apéndice de la parte recurrente, pág. 293.

los ruidos generados durante la operación afectaran los hogares cercanos.[24] Por otra parte, en cuanto a la presencia de especies en peligro de extinción, la agencia recurrida expresó que, "[n]o [habían] reportes de especies de flora o fauna Vulnerables o En Peligro de Extinción".[25]

De igual modo, a pesar de que la determinación de cumplimiento ambiental no hizo constar, de manera expresa, el impacto que el proyecto propuesto tendría sobre el tráfico del sector, en el documento de evaluación ambiental los proponentes detallaron el aumento de tránsito a generarse durante la fase de construcción y la fase de operación del proyecto.[26]

Es norma reiterada que, a las decisiones administrativas le merece amplia deferencia por parte de los tribunales apelativos. Ante ello, nuestro Tribunal Supremo ha señalado que, **la determinación de no requerir una DIA les compete a aquellas agencias especializadas**. Es por esto que, nuestro rol se limita a determinar si el criterio especializado de la agencia recurrida tuvo una base racional. *Hernández, Álvarez v. Centro Unido, supra.* Al examinar sosegadamente el expediente, constatamos que la determinación de cumplimiento ambiental emitida por la OGPe descansó en bases razonables. Así las cosas, somos del criterio que el proceso de evaluación ambiental no fue uno arbitrario, irrazonable, ilegal o contrario a derecho. Por todo lo cual, los errores tercero, cuarto y quinto no fueron cometidos.

Mediante el séptimo error señalado, los recurrentes advierten que Central Waste carecía de legitimación activa para presentar tal solicitud ante la agencia. Al respecto, aducen que la corporación solicitante debió presentar evidencia fehaciente para establecer su legitimación activa. En específico, señalan que le correspondía a la OGPe acreditar que el proponente es dueño de la propiedad, optante o arrendatario mediante la

---

[24] Apéndice de la parte recurrente, pág. 292.
[25] *Íd.*
[26] Apéndice de la parte recurrente, pág. 239.

documentación requerida en la Sección 2.1.9.5 (b) del Reglamento Conjunto. Contienden, además, que no existe evidencia sustancial en el expediente administrativo para constatar la legitimación activa del proponente, a pesar de que la OGPe determinó que JB Properties LLC autorizó a Central Waste para presentar la consulta de ubicación.

Luego de revisar detenidamente el expediente administrativo, determinamos que la legitimación activa de los proponentes fue debidamente acreditada, contrario a lo sostenido por los recurrentes. Conforme surge, obra en el expediente la escritura de compraventa mediante la cual JB Properties adquirió el predio de terreno objeto de la consulta de ubicación. Como dueño del terreno, JB Properties, a través de una comunicación fechada el 19 de julio de 2023 y presentada ante la OGPe, autorizó al ingeniero Nelson Reyes a "realizar las gestiones necesarias para la radicación de la enmienda a la consulta de ubicación 2009-03-0301-JPU para el Proyecto Central Waste Recycling".[27]

Al amparo del Reglamento Conjunto, la escritura pública, así como la autorización presentada por JB Properties, constituyeron prueba fehaciente de la legitimación activa del proponente. Como consecuencia, concluimos que la OGPe no incurrió en el séptimo error aquí señalado.

**IV.**

Por los fundamentos que anteceden, *se Confirma* la *Resolución* recurrida.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[27] Apéndice de la parte recurrente, pág. 318.